Wᴵʟᴍɪɴɢᴛᴏɴ Pᴀʀᴋɪɴɢ Aᴜᴛʜᴏʀɪᴛʏ, a body corporate and politic of
the State of Delaware, and Eᴀɢʟᴇ Cᴏғғᴇᴇ Sʜᴏᴘᴘᴇ, Iɴᴄ.,
a corporation of the State of Delaware,
Appellants,

*vs.*

Wɪʟʟɪᴀᴍ H. Bᴜʀᴛᴏɴ,
Appellee.

*Supreme Court on Appeal, January 11, 1960.*

*Clair John Killoran* and *David Snellenburg, II,* of Killoran & VanBrunt, Wilmington, for appellant, Wilmington Parking Authority.

*Thomas Herlihy, Jr.,* Wilmington, for appellant, Eagle Coffee Shoppe, Inc.

*Louis L. Redding,* Wilmington, for appellee, William H. Burton.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

WOLCOTT, Justice: This action seeks a declaratory judgment that Eagle Coffee Shop, Inc. (hereafter Eagle), the lessee of Wilmington Parking Authority (hereafter the Authority) may not operate its restaurant business in the parking structure at Ninth and Shipley Streets, Wilmington, in a racially-discriminatory manner. The action was commenced by the plaintiff, a Negro, who was denied service by Eagle solely because of his race, color and ancestry, which, plaintiff argues, abridged his rights guaranteed by the Fourteenth Amendment to the Constitution of the United States.

There are no disputed issues of fact. Consequently, all parties below moved for summary judgment. The Vice-Chancellor granted judgment for the plaintiff, holding that the Fourteenth Amendment is applicable to the operation of all aspects of the parking structure, and that it forbids discriminatory practices in the restaurant of the Authority's lessee. The defendants appeal.

The plaintiff's position is that the Authority is performing a public or state function in operating the public parking facility in ques-

tion and, as an instrumentality of the state, is required to insure that the operation of the public facility shall not be in a racially-segregated manner. Plaintiff further argues that Eagle, as lessee, is the instrumentality of the Authority, admittedly an agency of the state, and that its discriminatory acts are in law the acts of the state and, hence, violative of the Equal Protection Clause of the Fourteenth Amendment. The court below so ruled.

The Authority's position is that it has not discriminated racially against the plaintiff because it has no legal or *de facto* control over the operation of Eagle's restaurant. It argues that its sole interest in the Eagle lease is the deriving of rent therefrom in order to defray the expense of operating the parking facility, an otherwise unprofitable operation required, however, to be self-sustaining. Accordingly, the Authority argues that Eagle's refusal to serve the plaintiff was private and not state action subject to the interdict of the Fourteenth Amendment.

Eagle joins in the position taken by the Authority and, in addition, relies on 24 Del.C. § 1501 which provides that no restaurant shall by law be obligated to give service to persons if such service would be offensive to the major part of its customers to the injury of its business. This statute, Eagle argues, is a codification of the common law relating to the duties of restaurant keepers.

Since the decision of the Supreme Court of the United States in *Brown v. Board of Education of Topeka,* 347 *U.S.* 483, 74 *S.Ct.* 686, 98 *L.Ed.* 873, the states and their instrumentalities have been required to act within the scope of state action in a racially non-segregated manner. If, therefore, Eagle is, as plaintiff contends, the ultimate instrumentality of the state performing a state function, the Fourteenth Amendment requires it to serve the plaintiff and all others with his racial background.

The ultimate question for our determination, therefore, is whether or not, under the decisions cited to us, the Eagle restaurant business is cast with such public character as to make it in law a state function, carried on under the auspices and with the support of the public authority. We turn to the authorities cited to us for the answer.

*Nash v. Air Terminal Services, Inc.,* D.C., 85 *F.Supp.* 545, was a case decided under the now discarded doctrine of separate but equal facilities for Negroes. The case, however, seems pertinent not only because of its factual resemblance to the case at bar but, also, as an enunciation of a test for determining when certain actions may or may not be attributed to the public government.

In the Nash case the plaintiff, a Negro using the facilities of the Washington National Airport for air transportation, sought and was refused service in a restaurant operated in the terminal building. The restaurant in question was operated on a concession from the public government in a building constructed entirely with public money and operated for the serving of persons using an airport constructed entirely with public money. Under these facts it was held that the plaintiff had been denied his rights since, at the time, there were no separate but equal facilities offered for Negro patrons of the airport. *A fortiori,* if the failure to supply separate but equal facilities at a time when that doctrine was part of our constitutional law was a deprivation of the rights of the plaintiff, once that doctrine is struck down the plaintiff's rights would be denied by the refusal of any service.

*Derrington v. Plummer,* 5 *Cir.,* 240 *F.2d* 922, dealt with the refusal of service to a Negro in a cafeteria installed and operated in the basement of a county courthouse. The facts were that some time in 1953 the county contemplated the erection of a new courthouse. In the plans of the building a portion of the basement was set aside and reserved for a cafeteria to be operated primarily for the benefit of persons having business in the courthouse. The courthouse, including the cafeteria facilities, was completed entirely with public funds. Thereafter, the cafeteria was operated by a private lessee. The cafeteria served persons having business in the courthouse and public employees, and, also, was open to the public. The plaintiff, a Negro, sought service and was refused because of his race.

It was held that the lessee was subject to the prohibitions of the Fourteenth Amendment as the agent of the state. The rationale of the decision is that the courthouse having been built with public funds for the use of the public, the original plans having provided for the

inclusion of a cafeteria for the use of the public, and the cafeteria, itself, having been equipped and furnished by the county, the state could not avoid the constitutional requirement of nondiscrimination by leasing to a private business.

*Culver v. City of Warren,* 84 *Ohio Opp.* 373, 83 *N.E.2d* 82, was a case in which the plaintiffs, Negro citizens of Ohio, sought the right to use and enjoy a municipal swimming pool, built at public expense. It appeared that when completed the swimming pool had first been opened on a nondiscriminatory racial basis but that, from that, trouble and disorder had ensued. The city ceased to operate the swimming pool and leased it to a veterans organization at an annual rental of 10% of the gate receipts; the city, however, paying all maintenance costs. The veterans organization, the lessee, operated the pool in a racially-discriminatory manner.

It was held that the lease to the veterans organization was a subterfuge adopted by the city to avoid the requirements of the Fourteenth Amendment. The court was of the opinion that, under the circumstances, the veterans organization was an instrumentality of the city which, in turn, of course, was an instrumentality of the State of Ohio and, thus, was subject to the provisions of the Fourteenth Amendment.

Substantially to the same effect is the case of *Kern v. City Com'rs of City of Newton,* 151 *Kan.* 565, 100 *P.2d* 709, 129 *A.L.R.* 1156.

*Muir v. Louisville Park Theatrical Ass'n,* 347 *U.S.* 971, 74 *S.Ct.* 783, 98 *L.Ed.* 1112, was a case in which the City of Louisville had erected in one of its public parks an amphitheater, owned and maintained by the city. It appeared that the amphitheater was an appropriate adjunct of the city's park maintained for all the people. The city leased the structure to a theatrical association which, under the terms of its lease, had the right to charge admission fees and to sell refreshments. The plaintiff, a Negro, was denied admittance to a performance in the amphitheater given by the theatrical association.

The District Court held, and was affirmed on appeal to the Court of Appeals, that the city was guilty of no racial discrimination because there was no evidence that any comparable Negro theatrical association

had applied to the city for use of the amphitheater. On petition for certiorari to the Supreme Court of the United States the judgment in the Muir case was reversed and the case remanded for consideration in the light of *Brown v. Board of Education,* supra.

The reason for the reversal is not set forth in full, but it seems apparent that the Supreme Court had in mind the circumstances that the city had built and maintained from public funds an amphitheater for public use and, under the circumstances, any lessee operated it as an instrumentality of the city.

*Commonwealth of Pennsylvania v. Board of Directors of City Trusts,* 353 *U.S.* 230, 77 *S.Ct.* 806, 1 *L.Ed.2d* 792; 353 *U.S.* 989, 77 *S.Ct.* 1281, 1 *L.Ed.2d* 1146, was a *per curiam* opinion holding that the trustees under the will of Stephen Girard, appointed by the City of Philadelphia, could not perform their duties under the trust created for the education of "white male orphans" in a manner to discriminate against Negro male orphans. Plaintiff points out that Stephen Girard, by his will, had created a trust out of his private fortune but that, nevertheless, the principles of the Fourteenth Amendment were held to apply to the operation of the trust by the trustees. The element of public control, apparently, was that the trustees of the Girard Trust were publicly appointed trustees in complete control of the operation of a privately endowed trust.

We think a careful consideration of the foregoing cited authorities leads necessarily to the conclusion that the provisions of the Fourteenth Amendment relating to equal protection of the laws apply to the operation of any facility or any other thing created at public expense or operated by public authority.

In the Nash case, for example, the air terminal at the Washington National Airport had been erected solely with public funds and the restaurant involved had been contemplated initially as a service to persons using the National Airport. Furthermore, it is not clear that the public government did not exercise ultimate control over operation of the restaurant since it was operated as a concession of the public government.

Similarly, the Derrington case involved a facility constructed entirely with public funds which contained, from the planning stage onward, a cafeteria intended for the use of the public. The cafeteria, itself, was constructed and equipped by public money and was operated primarily for the benefit of the persons using the courthouse. Consequently, while technically there may have been no direct control over the lessee who operated the cafeteria, the lessee was nevertheless operating a facility erected entirely by the public treasury for the purpose of serving the public.

The Culver and Kern cases were cases also of publicly paid for facilities. These cases also contain the additional circumstance of an attempt by subterfuge to avoid the prohibitions of the Fourteenth Amendment. The Muir case similarly is a case of the erection and maintenance entirely with public funds of an appropriate adjunct of a public park.

The Girard College case, infra, apparently falls within the scope of the Fourteenth Amendment solely by reason of the fact that the trustees administering the trust created by Stephen Girard were publicly appointed. It is interesting to note that since the *per curiam* decision of the Supreme Court of the United States, the State of Pennsylvania has abrogated the right of the City of Philadelphia to appoint the trustees administering the Girard Trust, thus, presumably, eliminating the requirement that such trust be administered in a racially non-discriminatory manner. Cf. *In re Girard College Trusteeship,* 391 *Pa.* 434, 138 *A.2d* 844, certiorari denied 357 *U.S.* 570, 78 *S.Ct.* 1383, 2 *L.Ed.2d* 1546.

It thus seems apparent to us from the cited authorities that the Fourteenth Amendment is applicable to the operation of a facility, either public or quasi-public in nature, if either the facility has been erected and is maintained with public money, or if the operation of such a facility is conducted under public auspices or control.

We turn now to the particular facts of the case at bar. Initially, we should observe that the plaintiff in the case at bar has not been discriminated against by the Authority in the operation of the public parking portion of the facility since the record discloses that at the

time this incident occurred the plaintiff had parked his car in the public parking portion and, thereafter proceeded to the Eagle restaurant where he was denied service.

The facts surrounding this controversy and the physical aspect of the Authority's facility do not appear in much detail in the record before us. However, we think we are at liberty to take notice of certain physical facts concerning the matter which appear from a casual inspection of the facility, itself. We note, therefore, that the space in the Authority's structure leased by Eagle, while located within the exterior walls of the structure, has no marked public entrance leading from the parking portion of the facility into the restaurant proper. The main and marked public entrance to Eagle's restaurant is located on Ninth Street. It appears from the record before us, furthermore, that Eagle at its own expense installed the major portion of the furnishings of its restaurant and all of the necessary fixtures to make the leased space suitable for the operation of its business. The Authority installed a bare minimum in the space ultimately leased to Eagle.

The lease between the Authority and Eagle contains a covenant binding Eagle to "occupy and use the leased premises in accordance with all applicable laws, statutes, ordinances and rules and regulations of any federal, state or municipal authority." Plaintiff refers to this covenant but we think the covenant does not have much bearing on the basic question presented to us. We have for decision the broad question of whether or not the maintenance of the facility by the Authority, admittedly a state instrumentality, is in all its ramifications and details, including the leasing to private business, state action falling within the scope of the protective provisions of the Fourteenth Amendment. The referred to covenant is applicable to this case only if the answer to the broad question is in the affirmative since only under such circumstances would the Fourteenth Amendment be applicable to Eagle's business.

The question is to be decided in the light of the circumstances surrounding this entire matter. The nature of the enterprise conducted by the Authority is of primary importance to our decision. Unfortunately, the record before us is not as complete as we would

have desired. We think, however, that we may take notice of the facts embodied in the opinion in *Wilmington Parking Authority v. Ranken,* 34 *Del.Ch.* 439, 105 *A.2d* 614, on which plaintiff relies. In that case we upheld against attack the constitutionality of the Parking Authority Act of 1951 (22 Del.C. Ch. 5) and the legality of the proposed acts of the Authority pursuant to it.

In the Ranken case we had before us certain determinations made by the Authority in planning the erection of the facility in question. Thus, the Authority determined that in order to erect and operate the structure as a self-sustaining unit as required by the General Assembly, it would be necessary to obtain additional revenue from commercial leasing of space, and to utilize the space of the final structure upon the following ratio : 61% for parking ; 39% for private leases. We assume that the structure as actually completed maintains this ratio. The Authority made a further determination that the cost of construction, including the cost of land, would be divided upon the following ratio : 38.4% to parking space ; 61.6% to the leased area. We assume that this estimate of division of cost is the fact. Finally, the Authority determined that its revenue derived from the operation of the facility would come from these sources upon the following ratio : 30.5% from parking ; 69.5% from private leases. We assume this division to be the fact.

From the Ranken case it appears that the only public money used in the construction of the facility was the sum of $934,000 "advanced" by the City of Wilmington and used in the purchase of a portion of the land required. It did not appear in the Ranken case, and does not appear in the case now before us, what the terms and conditions of this "advance" by the city were.

We have not been furnished with the actual cost figures of the construction of the facility but since, in the Ranken case, the cost of construction of a parking facility alone was estimated to be approximately $3,800,000, and since the estimated cost allocated to parking space of a combined facility was 38.4%, we assume that the total cost of the presently existing facility was in the neighborhood of $6,100,000. It does appear as a fact, however, that the actual cost of construction

was paid from the proceeds of the sale of revenue bonds issued by the Authority and, accordingly, upon the determined ratios, the public money "advanced" for the project amounts to approximately 15% of the total cost of the facility as finally erected.

From the Ranken case, also, it appears that the revenue from parking alone was predicted to be $150,000 annually which was estimated to amount to 30.5% of the total expected revenue of the combined facility. Accordingly, the facility's total revenue we assume to be approximately $342,000 annually, of which approximately $212,000 is derived from the rentals to commercial enterprises.

In the Ranken case we considered a constitutional attack upon the Authority's proposal on the basis that it had no authority to enter into private leases solely for the purpose of obtaining revenue to support the operation of the public part of the facility, viz., the furnishing of an off-street parking. We held, however, that the authority to lease to private business was valid. We held that the furnishing of off-street parking was a proper public purpose and met an existing need supported by a legislative finding to that effect and, since it was the fact that the proper public purpose could not be supplied as a self-supporting unit without additional revenue to be supplied by commercial leases, we held that the entering into such private leases did not destroy the public-use character of the facility.

We recognized in the Ranken case that the proposed leases to private businesses were wholly unrelated to the public purpose to be subserved by the parking facility, except as a source of additional revenue to permit the financing and operation of the parking facility. We were of the opinion that the supplying of off-street parking services occupying 61% of the total space of the structure, despite the leasing of the balance of the space to private business, was and remained the paramount or primary use of the structure. We held, therefore, that the leasing to private business, while necessary financially to the project, was nevertheless a subordinate or incidental use of public property. We, accordingly, upheld the constitutionality of the grant of power to lease which, in the absence of such circumstances, would have been an unconstitutional use of public property.

We summed up our holding in the Ranken case in the following language [34 *Del.Ch.* 439, 105 *A.2d* 627] :

"Since the dominant or underlying purpose of the contemplated project subserves a public use, commercial leasing of space therein for uses unrelated to the public use is permitted to the extent, and only to the extent, that such leasing is necessary and feasible to enable the Authority to finance the project."

We think it apparent, therefore, that the only connection Eagle has with the public facility operated by the Authority is the furnishing of the sum of $28,700 annually in the form of rent which is used by the Authority to defray a portion of the operating expense of an otherwise unprofitable enterprise.

We think the case before us is distinguishable from the cases relied on by the plaintiff. In the first place, it is quite apparent, nor is there any suggestion to the contrary made by the plaintiff, that the establishment of a restaurant in the space occupied by Eagle is a pure happenstance and was not intended as a service to the public using the parking facility. As far as the record before us indicates, it was immaterial to the Authority what type of business would occupy the space now occupied by Eagle. The Authority's sole interest was in the obtaining of money in the form of rent. That money is thereafter used by the Authority to support the public purpose of supplying off-street parking from which the plaintiff and the rest of the public benefit.

It is further clear from this record, and from the Ranken case, that at no time did the Authority contemplate the establishment of a restaurant in the structure for the use of its parking patrons. On the contrary, the commercial leases entered into by the Authority were given to the highest bidders in terms of rent after the solicitation of bids by public advertisement. The decision to lease to a particular lessee was made upon the considerations of the applicants' financial responsibility and the amount of rent agreed to be paid. It is thus apparent that this case completely lacks the element of furnishing service to the public through the means of a lease to private enterprise. The only purpose for this lease is to supply a portion of the additional

money required to permit the Authority to furnish the only public service it is authorized to furnish, viz., public off-street parking.

The plaintiff argues that the use of public money to purchase a portion of the land required brings this case within the rule of the cited authorities. But we think not. At the most, approximately 15% of the total cost is represented by the public "advance" of money. To accept the plaintiff's view would require us in all similar cases to measure the respective contributions made by public and private money and to determine at what point the public contribution changes the nature of the enterprise. It is obvious that there is no guide for judicial speculation upon such a matter. If it is said that the contribution of any public money is sufficient to change the nature of the enterprise, the answer is that it has been held that a slight contribution is insufficient. Cf. *Eaton v. Board of Managers, D.C.,* 164 *F.Supp.* 191.

Fundamentally, the problem is to be resolved by considerations of whether or not the public government, either directly or indirectly, in reality, is financing and controlling the enterprise which is charged with racial discrimination. If such is the case, then the Fourteenth Amendment applies; if it is not the case, the operators of the enterprise are free to discriminate as they will. *Shelley v. Kraemer,* 334 *U.S.* 1, 68 *S.Ct.* 836, 842, 92 *L.Ed.* 1161. We neither condemn nor approve such private discriminatory practices for the courts are not the keepers of the morals of the public. We apply the law, whether or not that law follows the current fashion of social philosophy.

Particularly is this true of a state court which is called upon in this field to apply rules made for us by the Supreme Court of the United States which, in the case of this state, have resulted in the discard of a large portion of our local law dealing with the emotional subject of racial relations. We are, of course, bound to follow the Federal decisions, but we think we are equally bound, when they erode our local law, not to extend them to a point beyond which they have not as yet gone.

We think the Authority and, through it, the State of Delaware does not operate, either directly or indirectly, the business of Eagle;

has not located the business of Eagle within the facility for the convenience and service of the public using the parking service; and has not financially enabled the business of Eagle to operate. The only concern the Authority has with Eagle is the receipt of rent, without which it would be unable to afford the public the service of off-street parking. This circumstance, we think, is not sufficient to make the discriminatory act of Eagle the act of the State of Delaware.

■■ It follows, therefore, that Eagle, in the conduct of its business, is acting in a purely private capacity. It acts as a restaurant keeper and, as such, is not required to serve any and all persons entering its place of business, any more than the operator of a bookstore, barber shop, or other retail business is required to sell its product to every one. This is the common law, and the law of Delaware as restated in 24 Del.C. § 1501 with respect to restaurant keepers. 10 *Am. Jur.*, Civil Rights, §§ 21, 22; 52 *Am.Jur., Theatres,* § 9; *Williams v. Howard Johnson's Restaurant,* 4 *Cir.,* 268 *F.2d* 845. We, accordingly, hold that the operation of its restaurant by Eagle does not fall within the scope of the prohibitions of the Fourteenth Amendment.

■ Finally, plaintiff contends that 24 Del.C. § 1501, has no application in the case at bar because Eagle, since it serves alcoholic beverages to its patrons, is a tavern or inn and not a restaurant. It is argued that, at common law, an inn or tavern could deny service to no one asking for it. We think, however, that Eagle is primarily a restaurant and thus subject to the provisions of 24 Del.C. § 1501, which does not compel the operator of a restaurant to give service to all persons seeking such.

For the foregoing reasons, the judgment of the court below is reversed.